IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2020 JAN 30 PM 2: 09

DEPUTY CLERK____BMH

| | | |
|---|---|---|
| LONNIE KADE WELSH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:17-CV-095-BQ |
| | § | |
| CORRECT CARE, LLC, *et al.* | § | |
| | § | |
| Defendants. | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court is pro se Plaintiff Lonnie Kade Welsh's Amended Complaint (ECF No.

55) and Defendants Marsha McLane and Michael Searcy's Motion to Dismiss Pursuant to Federal

Rule of Civil Procedure 12(b)(6), as well as their Brief in Support.  ECF Nos. 62, 63.  For the

reasons stated herein, the undersigned United States Magistrate Judge recommends that the United

States District Court **GRANT** Defendants' Motion to Dismiss.

## I.    Procedural History

On August 15, 2016, Plaintiff Lonnie Kade Welsh filed an "Original Petition for Damages"

in the 154th District Court, Lamb County, Texas.  ECF No. 1-6.  That petition named Correct Care,

LLC, as the sole Defendant.  *Id.*  Welsh then filed an "Amended Petition" on March 24, 2017,

naming Bill Vanier, Janie Salazar, Mary Leeks,[1] Brian Thomas, Amy Goldstein, Christopher

Woods, Michael Searcy, Marsha McLane, and Correct Care, LLC, as Defendants; he also

submitted a request for injunctive relief the same day.  ECF Nos. 1-12, 1-13.  On April 17, 2017,

Welsh filed a second "Amended Petition," naming the same Defendants as in his previous

---

[1] Welsh's spelling of Mary Leeks's surname changed during the course of this litigation.  Throughout this Report and
Recommendation, the undersigned utilizes the spelling of Ms. Leeks's surname as it is presented in Welsh's current
Amended Complaint. *See* ECF No. 55, at 12.

1

Amended Petition. ECF No. 1-19. Based on the record before the Court, it appears Defendants McLane and Searcy filed a Notice of Removal in state court on May 1, 2017, and in the United States District Court for the Northern District of Texas three days later. ECF No. 1-20; *see* ECF No. 1.

After removing the case to federal court, Defendants McLane and Searcy filed a Partial Motion to Dismiss on May 5, 2017, seeking dismissal of every claim in Welsh's second amended petition, except for an injunctive relief claim against McLane, for which McLane filed a separate Answer. ECF Nos. 3–5. Welsh did not respond to Defendants' Motion to Dismiss; instead, on June 5, 2017, Welsh filed an Amended Complaint that stated claims only against Defendants McLane and Searcy. ECF No. 7. Welsh also filed several other documents, including a "Motion for Default Judgment Against All Defendants," throughout July and August 2017. *See* ECF Nos. 8–11. Defendants did not directly respond to any of these motions or other documents.

On September 7, 2017, this Court issued an order denying Defendants' Partial Motion to Dismiss as moot, explaining that Welsh had filed an Amended Complaint after the motion and that the Amended Complaint was the live pleading. *See* ECF No. 13. The Court also gave Defendants McLane and Searcy twenty-one days from the date of the order to "file a new motion to dismiss, answer, or any other responsive pleadings." *Id.* at 2. By that same order, the Court denied Welsh's three then-pending motions and, specifically as to the Motion for Default Judgment, held that "no proof of service has been filed showing that these Defendants [Christopher Woods, Mary Leeks, Amy Goldstein, Janie Salazar, Bill Vanier, Brian Thomas, and Correct Care, LLC (collectively hereinafter the "non-answering Defendants")] have been served with a summons or complaint." *Id.*

The Court entered a separate order that same day admonishing Welsh that his "claims against [the non-answering Defendants] will be dismissed without prejudice if proof of service has not been filed by 9:00 a.m. on September 29, 2017." ECF No. 14.  On September 27, 2017, Welsh filed three documents:  (1) a "Motion to Modify Court Docket," through which Welsh claimed his Amended Complaint did not abandon, but in fact incorporated, his claims against the non-answering Defendants; (2) an affidavit setting out Welsh's calculation of damages for his claims against the non-answering Defendants; and (3) a "Motion to enter default judgment," including documents Welsh claimed prove that he served the non-answering Defendants between April 4 and 13, 2017.  ECF Nos. 15–17.  On October 10, 2017, this Court denied Welsh's Motion to enter default judgment "because the live pleading in this case [i.e., the Amended Complaint Welsh filed on June 5, 2017] does not advance any claims against [the non-answering Defendants]" and because Welsh failed to seek a clerk's entry of default before moving for a default judgment.  ECF No. 20.  By the same order, the Court also denied Welsh's Motion to Modify Court Docket.  *Id.*

During this exchange of pleadings and orders, and in response to the Court's September 7 order (ECF No. 13), Defendants McLane and Searcy filed a Partial Motion to Dismiss and brief in support on September 28, 2017.  ECF Nos. 18, 19.  Through the motion, McLane and Searcy argued that Welsh's Amended Complaint failed to state a claim on which relief could be granted and, in the alternative, that McLane and Searcy were entitled to qualified immunity.  *See* ECF Nos. 18, 19.  The motion did not address or seek dismissal of Welsh's substantive due process claim regarding sex offender treatment.  ECF No. 19, at 23.  Welsh did not respond to Defendants McLane and Searcy's Partial Motion to Dismiss; instead, he filed a motion on October 17, 2017, seeking to dismiss this action voluntarily, without prejudice.  ECF No. 23.

On November 20, 2017, the District Court granted Welsh's motion for voluntary dismissal without prejudice, noting that "[n]o Defendant has filed an answer or motion on summary judgment." ECF No. 23. Ten days later, on November 30, the District Court issued a nunc pro tunc order clarifying that the November 20 order was entered in error, and that Welsh's claim should have been dismissed with prejudice. ECF No. 24. The November 30 order vacated the previous order and dismissed the action with prejudice as of November 20. *Id.* Welsh filed a Notice of Appeal on December 21, 2017, challenging the dismissal with prejudice. ECF No. 26.

In an opinion issued February 7, 2019, the Fifth Circuit held that because McLane had filed an answer to one of Welsh's earlier pleadings, Welsh could not seek voluntary dismissal without a court order as to McLane. *See Welsh v. Correct Care, L.L.C.*, 915 F.3d 341, 344 (5th Cir. 2019). The court noted that "the Rules permit voluntary dismissal by notice and without a court order of any defendant who has not served an answer, which in this case is all defendants except McLane." *Id.* (citing Fed. R. Civ. P. 41(a)(1)(A)(i)). As to McLane, the court explained that Welsh was "entitled to dismissal by motion under Rule 41(a)(2) 'on terms that the court considers proper' with the opportunity to retract his motion to dismiss if he finds the court's conditions too onerous." *Id.* The Fifth Circuit thus held that the district court's dismissal with prejudice was an abuse of discretion, vacated the Order of Dismissal, and remanded. *Id.*

On March 4, 2019, Welsh filed a Motion to Withdraw (ECF No. 37) the prior motion for voluntary dismissal (*see* ECF No. 22). The United States District Judge granted Welsh's motion on April 1, 2019, and transferred the case to the undersigned United States Magistrate Judge for further proceedings. ECF Nos. 41, 42. In this Court's view, granting Welsh's request to withdraw his motion for voluntary dismissal closed the loop on all issues remanded by the Fifth Circuit for

consideration and, as a result, no outstanding matters remain for this Court to determine in regard to the remand.

On April 25, 2019, Defendants Marsha McLane and Michael Searcy filed a "Status Report advisory" and a "Motion for Partial Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c)," along with a brief in support of the motion. ECF Nos. 43, 44, 45. On July 30, 2019, however, Welsh sought leave to amend his complaint once more. ECF No. 53. The Court granted leave to amend and ordered that Welsh's Amended Complaint be docketed. ECF No. 54.

Welsh's live pleading is now the Amended Complaint filed August 8, 2019. ECF No. 55. Defendants McLane and Searcy have since filed another motion and brief seeking dismissal of Welsh's claims in their entirety. ECF Nos. 62, 63. Welsh has not responded to this motion to dismiss, but has filed numerous motions requesting (1) sanctions (ECF No. 64), (2) appointment of an expert (ECF No. 65), (3) to convene a three-judge tribunal (ECF No. 72), and (4) certification of an interlocutory appeal, and raising various objections to the undersigned's decisions on those matters (ECF Nos. 68, 78, 79), all of which the Court has denied. *See* ECF Nos. 66, 69, 75, 76, 77.

## II.    <u>Standard of Review</u>

To survive a Rule 12(b)(6) motion, a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering 12(b)(6) motions, courts must accept well-pleaded facts (not mere conclusory allegations) as true and view them in the light most favorable to the plaintiff. *Twombly*,

550 U.S. at 555 (explaining that a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 520 (5th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678) (stating that courts accept all well-pleaded facts as true, but "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements' cannot establish facial plausibility").

A court need only determine whether the plaintiff has stated a legally cognizable claim; it does not evaluate whether the plaintiff is ultimately likely to prevail. *See United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). "The court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (citing *Fee v. Herndon*, 800 F.2d 804, 807 (5th Cir. 1990)).

### III.    Background

On October 15, 2015, the 435th District Court of Montgomery County, Texas, adjudged Welsh to be a sexually violent predator (SVP), as defined by Texas Health & Safety Code § 841.003. Am. Compl. 57, ECF No. 55.[2] Welsh is housed in the Bill Clayton Detention Center in Littlefield, Texas,[3] where he remains confined for inpatient treatment in accordance with the provisions of Texas Health & Safety Code § 841.081. Defs. Br. 8.

Welsh's Amended Complaint names as Defendants only Marsha McLane, in her official and individual capacities, and Michael Searcy, in his individual capacity. Am. Compl. 1. McLane is the Executive Director of TCCO and Searcy is a TCCO compliance officer at TCCC. *Id.*; Defs.

---

[2] Page citations to Welsh's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

[3] The Bill Clayton Detention Center is also known as the Texas Civil Commitment Center (TCCC). At the time of the events alleged in Welsh's Amended Complaint, Correct Care Recovery Solutions (CCRS) operated TCCC under a contract with the Texas Civil Commitment Office (TCCO). Defs.' Br. in Supp. of Defs.' Mot. Dism. 8, ECF No. 63 [hereinafter Defs. Br.].

Br. 8, 10. Insofar as Welsh's individual capacity claims are concerned, they can be summarized as alleging McLane and Searcy are liable in their capacity as supervisors for: (1) the conduct of CCRS and TCCO employees; (2) failing to properly train CCRS and TCCO employees; and (3) implementing policies that allegedly violate Welsh's constitutional rights. Am. Compl. 1–30. Welsh further requests injunctive relief against McLane, in her official capacity, concerning various TCCC/TCCO policies. *Id.* at 31–40. Finally, Welsh implicitly attacks the constitutionality of Texas Health & Safety Code Chapter 841, alleging that it "invidiously single[s] out a politically unpopular group to impose a significant burden" on sex offenders. *Id.* at 40–55.

## IV.    Discussion

The Court will separately address the three main theories set forth in Welsh's Amended Complaint: (1) individual capacity claims against Defendants Searcy and McLane for various alleged constitutional violations resulting from assorted TCCC policies, and Defendants' purported failure to train subordinates; (2) official capacity claims against Defendant McLane seeking injunctive relief concerning TCCC operations; and (3) a constitutional challenge to Chapter 841.

### A. Individual capacity claims against Searcy and McLane

Before exploring the specifics of Welsh's Amended Complaint, the Court must first explore Welsh's litigation history because it plays a dispositive role concerning his individual capacity claims. In January 2018, Welsh filed another civil rights lawsuit naming CCRS and numerous TCCO and CCRS employees (among others) as Defendants. *Welsh v. Correct Care Recovery Solutions*, Civil Case No. 5:18-cv-020-BQ (N.D. Tex.) [hereinafter *Welsh I*].[4] In *Welsh*

---

[4] The Court refers to this 2018 case as *Welsh I* because, although the current action before the Court was filed first, the Court has entered a judgment in the 2018 case. *Welsh I*, ECF Nos. 43, 44 (dismissing Welsh's claims with prejudice).

*I*, this Court ultimately dismissed all claims asserted in Welsh's amended complaint with prejudice. *Id.* at ECF Nos. 20, 43, 44. Upon examination of the Amended Complaint currently before the Court (ECF No. 55), and the amended complaint this Court dismissed with prejudice in *Welsh I* (*Welsh I*, ECF No. 20), it is plain that Welsh's current claims arise from the same transactions or occurrences as those identified in *Welsh I*. This necessarily brings the question of claim preclusion to the forefront of the Court's consideration of Welsh's claims herein.

Claim preclusion, also known as res judicata, "bars the litigation of claims that either have been litigated or should have been raised in an earlier suit." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005). Claim preclusion requires the satisfaction of four elements: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Id.* There is no question that this Court was a court of competent jurisdiction when it decided *Welsh I* and that the prior action was concluded by a final judgment on the merits. *See Welsh I*, ECF Nos. 43, 44 (dismissing all claims with prejudice). Thus, the only questions the Court must resolve are whether the first and fourth elements are met, i.e. privity of parties and equivalency of the claims.

The Court notes that Defendants Searcy and McLane did not raise res judicata as a defense in either their Answer, Motion to Dismiss, or Brief in Support. ECF Nos. 62, 63, 70. As an affirmative defense, res judicata must generally be pleaded by the defendant. *See* Fed. R. Civ. P. 8(c)(1). The Fifth Circuit, however, has recognized two exceptions to this rule: The first states that "[d]ismissal by the court sua sponte on res judicata grounds . . . in the interest of judicial economy [is appropriate] where both actions were brought before the same court," and the second

provides that sua sponte application of res judicata is permissible "where all of the relevant facts
are contained in the record . . . and all are uncontroverted." *McIntyre v. Ben E. Keith Co.*, 754 F.
App'x 262, 264–65 (5th Cir. 2018) (quoting *Mowbray v. Cameron Cty.*, 274 F.3d 269, 281 (5th
Cir. 2001)); *see Arizona v. California*, 530 U.S. 392, 412 (2000) (quoting *United States v. Sioux
Nation of Indians*, 448 U.S. 371, 432 (1980) (Rehnquist, J., dissenting)) ("[I]f a court is on notice
that it has previously decided the issue presented, the court may dismiss the action *sua sponte,*
even though the defense [of res judicata] has not been raised. This result is fully consistent with
the policies underlying res judicata:  it is not based solely on the defendant's interest in avoiding
the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial
waste."). Both Welsh's current action and his prior case (*Welsh I*) were brought before the United
States District Court for the Northern District of Texas in the Lubbock Division. Further, the
undersigned presided over *Welsh I* and dismissed it with prejudice after Welsh consented to
proceed before a United States Magistrate Judge. *See Welsh I*, ECF Nos. 11, 43, 44. Thus, the
first exception for sua sponte application of res judicata to Welsh's claims is met. *McIntyre*, 754
F. App'x at 264. The second exception also applies because the Court's analysis is limited to those
facts and allegations raised in the complaints Welsh has filed in both the current case and *Welsh I.
Id.* As such, the Court may raise the issue of res judicata on its own volition and dismiss Welsh's
individual capacity claims (Counts One through Seven) on that basis. *Id.* (affirming district court's
sua sponte dismissal of complaint on the basis of res judicata).

### 1.  The claims raised in Welsh's Amended Complaint (ECF No. 55) are the same as those the Court dismissed with prejudice in *Welsh I.*

When determining whether a new case raises the same claims or causes of action as a prior
case, the Fifth Circuit applies a "transactional test." *Test Masters*, 428 F.3d at 571. "Under that
test, the preclusive effect of a prior judgment extends to all rights the original plaintiff had 'with

respect to all or any part of the transaction, or series of connected transactions, out of which the [original] action arose.'" *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395–96 (5th Cir. 2004) (quoting Restatement (Second) of Judgments, § 24)). "It is the 'nucleus of operative facts' in the first action, rather than the 'facts litigated' or the 'type of relief requested, substantive theories advanced, or types of rights asserted, [that] defines the claim.'" *Fitch v. Wells Fargo Bank, N.A.*, 423 B.R. 630, 640 (E.D. La. 2010) (quoting *United States v. Davenport*, 484 F.3d 321, 326–27 (5th Cir. 2007)); *see also Test Masters*, 428 F.3d at 571; *Petro-Hunt*, 365 F.3d at 396; *Offiong v. Holder*, 864 F. Supp. 2d 611, 617 (S.D. Tex. 2012) (quoting *In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir. 1999)) (stating that the Fifth Circuit's analysis "focuses upon whether the two cases under review are based on 'the same nucleus of operative facts'").

> a.  *Count One of Welsh's Amended Complaint has the same nucleus of operative facts as Count One of* Welsh I.

In Count One of Welsh's Amended Complaint, he alleges that on January 22, 2016, CCRS employees Jane Salazar, Amy Goldstein, and Bill Vanier improperly placed him in punitive isolation after he used vulgar language toward another CCRS employee. Am. Compl. 2. Welsh specifically singles out Bill Vanier's use of handcuffs to restrain him, claiming that Vanier used excessive force by using "the teeth of the handcuffs as a weapon to cause plaintiff to bleed an[d] carrying the long term effect of scarring." *Id.* Welsh asserts that he spoke with Defendant Michael Searcy in the following days and Searcy told him "that he has authorized the staff . . . to make the choice as to when to use restraint and the use of punitive isolation. He also informed [Welsh] that Bill Vanier did nothing wrong when he used a weapon against [Welsh]." *Id.* Welsh accuses Searcy of violating his rights under the First and Fourteenth Amendments by failing to train CCRS employees and implementing unconstitutional policies, practices, or customs that led to the violation of his rights by CCRS employees. *Id.* at 2–4.

Welsh's factual allegations here align with those raised in Count One of *Welsh I*. There, Welsh asserted that on January 22, 2016, CCRS employees Jane Salazar, Amy Goldstein, and Security Captain Vanier violated his constitutional rights by unlawfully seizing him and placing him in punitive isolation in retaliation for his "using his right to speech," and he further claimed that Vanier used excessive force when Vanier "used the metal jagged edge of the teeth of the . . . handcuff as a weapon," and "did grind the teeth of the cuff into plaintiff's right ring finger. This abuse caused the plaintiff's right ring finger to bleed, with the long-term effect of a scar." *Welsh I*, ECF No. 20, at 4–6.[5] This Court dismissed Welsh's claim of excessive force on the grounds that it was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) because Welsh had been convicted of the criminal offense of assault causing bodily injury for biting Jane Salazar during the January 22 incident. *Welsh I*, ECF No. 43, at 11–12. The Court further rejected Welsh's claim of retaliation under the First Amendment after concluding he failed to establish either that he engaged in constitutionally protected speech or that Salazar, Goldstein, and Vanier intended to retaliate against him for engaging in said speech. *Id.* at 12–14.

Prior to examining res judicata's application to Count One, the Court notes as an initial matter that Welsh's excessive force claim against Searcy remains barred by *Heck v. Humphrey*, as previously found in *Welsh I*. Welsh has failed to plead facts or provide any information, in his Amended Complaint or elsewhere, demonstrating that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486–87; *see also Welsh I*, ECF No. 43, at 12 (dismissing "Welsh's excessive force, false arrest, and detention claims in Count 1 until Welsh has satisfied

---

[5] Page citations to the amended complaint in *Welsh I* refer to the electronic page number assigned by the Court's electronic filing system.

the conditions of *Heck*"). Because a judgment in Welsh's favor here on the claim contained in Count One against Searcy—that Searcy's alleged failure to train subordinates or implementation of certain policies caused the alleged violations of his constitutional rights—would necessarily imply the invalidity of Welsh's underlying criminal conviction, *Heck* requires dismissal of Count One herein, unless and until Welsh shows that his conviction for assault causing bodily injury for biting Captain Salazar during the January 22 occurrence has been reversed or otherwise rendered invalid. *See, e.g., Smith v. Davenport,* Civil Action No. 3:16CV85-GHD-DAS, 2017 WL 1750827, at *3–4 (N.D. Miss. May 3, 2017) (finding plaintiff's excessive force claim *Heck*-barred where plaintiff had pleaded guilty to assault of an officer and the events giving rise to plaintiff's conviction were the same as those out of which his excessive force claim arose); *Fabre v. Yoli,* Civil Action No. 14-2220, 2015 WL 5773979, at *2–3 (E.D. La. Sept. 30, 2015) (dismissing plaintiff's excessive force and failure to protect claims as *Heck* barred when they arose out of incident for which plaintiff was convicted of battering and resisting an officer); *Parker v. Moreno,* No. 3:01CV1283–D, 2002 WL 1758181, at *4 (N.D. Tex. July 26, 2002) (recommending dismissal of plaintiff's claims for police brutality and excessive force, where a favorable ruling on such claims would "necessarily implicate the validity of a conviction for assault on a public servant").

Concerning res judicata's application to Count One as it compares to the same count in *Welsh 1*, it is plain that, as set forth above, the two claims have the same nucleus of operative facts: The placement in punitive isolation by the identical group following Welsh's alleged exercise of free speech rights and an allegation of excessive force involving the use of handcuffs by Bill Vanier. Thus, the two claims alleged in Welsh's current Amended Complaint are the same as those contained in the amended complaint of *Welsh I*, and which this Court previously dismissed with prejudice.

      b. *Count Two of Welsh's Amended Complaint has the same nucleus of operative facts as Count Two of* Welsh I.

Count Two of Welsh's Amended Complaint asserts that on January 22, 2016, pursuant to CCRS's Behavior Management policy, Defendants placed him in "punitive isolation for twenty-three hours a day with one hour of out of cell time," which continued until February 10, 2016. Am. Compl. 6. Welsh alleges that the purpose of the confinement "was to punish and hold for the County of Lamb by pending criminal charges." *Id.* Welsh further complains about the seizure of hygiene-related property. *Id.* Welsh states that he met with Defendant Searcy who allegedly informed Welsh that he had been so confined because of pending criminal charges. *Id.* Welsh claims that Searcy violated his rights under the Fourth, Fifth, and Fourteenth Amendments by approving policies that led to his placement in punitive isolation and the denial of access to certain property. *Id.* at 7–8.

Welsh's factual allegations here follow those presented in Count Two of *Welsh I.* In that case, Welsh claimed he was unreasonably seized on January 22, 2016, and placed in punitive isolation until February 10, 2016, pursuant to a CCRS policy for behavior management. *Welsh I*, ECF No. 20, at 12. Welsh also asserted that CCRS "seized [his] property by policy [from] January 22, 2016 to February 10, 2016," which included the seizure and denial of certain clothing and hygiene items by CCRS employee Mary Leeks. *Id.* Welsh previously argued that various defendants, among them CCRS and Mary Leeks, violated his rights under the Fourth, Fifth, and Fourteenth Amendments by their actions. *Id.* at 12–14. This Court dismissed all of Welsh's claims in Count Two with prejudice. *Welsh I*, ECF No. 43. It dismissed Welsh's procedural due process claim because his placement in punitive isolation did not amount to an extreme deprivation that imposed an "atypical and significant hardship[] in relation to the ordinary incidents of his commitment." *Id.* at 15–18. The Court further rejected his substantive due process claim because

Welsh did not adequately plead facts "demonstrating that his placement in the [secured management unit (SMU)]—after he disobeyed orders and bit Captain Salazar—'lacked a reasonable relation to' the purpose for which he had been committed." *Id.* at 18–19. As to the claims concerning Mary Leeks and the alleged denial of clothing and hygiene items, this Court dismissed them on the basis that his living conditions did not constitute a "substantial departure from accepted professional judgment." *Id.* at 20–21 (quoting *Youngberg v. Romero*, 457 U.S. 307, 323 (1982)). To the extent that Welsh asserted claims for unlawful confiscation of property under various theories, this Court dismissed those claims because "an intentional deprivation of personal property does not give rise to a viable constitutional claim as long as the prisoner has access to an adequate state post-deprivation remedy," and Texas provides such a remedy. *Id.* at 63–64.

As such, these claims arise from the same nucleus of operative facts as those asserted in *Welsh I*'s amended complaint and that the Court previously dismissed with prejudice: Welsh's placement in punitive isolation on January 22, 2016, pursuant to a CCRS policy, and the denial of access to certain property, including hygiene items, during his placement.

> c. *Count Three of Welsh's Amended Complaint has the same nucleus of operative facts as Counts Six and Seven of* Welsh I.

In Count Three of Welsh's Amended Complaint he alleges that on March 21, 2017, a CCRS security employee named Flores "did kick a handcuff port door . . . several times until he injured plaintiff['s] left hand by leaving a bruise that lasted several weeks." Am. Compl. 10. Further, Welsh alleges that on March 22, 2017, CCRS security employee Richardson repeatedly kicked the same handcuff port door causing various injuries to Welsh's left hand. *Id.* Welsh states that Defendant Searcy told him during a meeting that Flores and Richardson's actions were acceptable. *Id.* Welsh accuses Searcy of violating his Fourteenth Amendment rights by failing to properly train Flores and Richardson regarding the use of force and by implementing unconstitutional

policies, practices, or customs that led to the violation of his rights by Flores and Richardson. *Id.*
at 10–11.

These claims track the assertions raised in Counts Six and Seven of the amended complaint
in *Welsh I*. There, Count Six alleged that on March 21, 2017, Adrian Flores, a security official at
TCCC "commit[ted] the act of aggravated assault with a weapon by deliberately kicking repeatedly
a metal trap door located by opening on a locked confinement cell." *Welsh I*, ECF No. 20, at 38.
Count Seven accused Officer Richardson of "kicking [a] metal trap several times with plaintiff's
hand caught inside," which caused various injuries to his hand. *Id.* at 44–45. This Court dismissed
both claims with prejudice. *Welsh I*, ECF No. 43, at 43–51. The Court applied the factors set out
in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), to determine whether the force used was
objectively unreasonable under the circumstances. *Id.* After examining the totality of the
circumstances, the Court determined that the force was not objectively unreasonable and did not
violate Welsh's rights. *Id.*

Once more, the claims here arise from the same nucleus of operative facts as those in *Welsh
I*: CCRS employees Flores and Richardson allegedly used excessive force by kicking a port in
Welsh's door while his hand was in the port, causing injuries to Welsh's hand. The claim asserted
in Count Three of Welsh's Amended Complaint is identical to Counts Six and Seven in *Welsh I*.

         *d.  Count Four of Welsh's Amended Complaint has the same nucleus of operative facts
            as Count Three of* Welsh I.

The allegations in Count Four begin with Welsh's dissatisfaction over the delivery of his
legal mail to TCCC while incarcerated at the Lamb County Jail on February 17, 2016. Am. Compl.
12. Welsh states he did not return to TCCC until March 24, 2016.[6] *Id.* Welsh further claims that

---

[6] Welsh's Amended Complaint first identifies March 24, *2017*, as the operative date, but this appears to be a
typographical error because Welsh states just a few words later that "[f]rom March 24, 2016 to April 11, 2016 [CCRS]
employee Mary Leeks . . . refuse[d] to do her duty to deliver the legal mail to plaintiff in a timely fashion." *Id.*

CCRS employee Mary Leeks "refuse[d] to do her duty to deliver the legal mail to plaintiff in a timely fashion." *Id.* Specifically, Welsh asserts that he did not promptly receive important legal mail, thus preventing him from conferring with legal counsel concerning a matter on appeal. *Id.* Here, Welsh accuses both Searcy and McLane of violating his rights because they were "deliberately indifferent to the obvious need to have a policy in place to insure [sic] the protection of plaintiff['s] First and Fourteenth Amendment right to access to the courts and undisturbed communication with his attorney." *Id.*

These allegations align with the factual basis of Count Three of Welsh's complaint in *Welsh I.* Welsh alleged that CCRS and Mary Leeks violated his constitutional right to access the courts by failing to timely deliver his mail. *Welsh I*, ECF No. 20, at 19–20. Welsh stated that in February 2016, while housed in the Lamb County Jail, TCCC received legal mail addressed to him. *Id.* at 19. Welsh further indicated that he returned to TCCC "on or about March 22, 2016 [and] did not receive his legal mail until Friday April 7, 2016." *Id.* Welsh claimed that this delay made it impossible for him to timely communicate with his legal counsel concerning issues in his appeal because appellate briefs were due to be filed on April 11, 2016. *Id.* Welsh also asserted that CCRS "failed to train Mary Leeks properly" and that it "had no policy in place to insure [sic] the timely delivery of legal mail." *Id.* at 19. This Court concluded that, to establish a constitutional violation, "a plaintiff must show that the defendant intentionally delayed or interfered with his legal mail and that such interference caused the plaintiff actual injury or harm." *Welsh I*, ECF No. 43, at 22–24 (emphasis omitted). The Court determined that Welsh had not alleged intentional action on the part of Mary Leeks or CCRS, and it further noted that Welsh admitted "he did not attempt to update his address with his attorney, [nor did he] contend that he asked TCCC officials

16

to forward his mail to the Lamb County Jail." *Id.* at 23–24. Thus, the Court dismissed Count Three with prejudice. *Id.*

The claims in Count Four of Welsh's Amended Complaint have the same nucleus of operative facts as those raised in Count Three of *Welsh I*: Welsh complains of a delay in receiving legal mail delivered to TCCC while he was in Lamb County Jail, which he alleges led to his inability to effectively communicate with legal counsel concerning a pending appeal. Welsh further claims in each that Mary Leeks was the individual personally responsible for the delay and that the lack of a policy concerning timely mail delivery contributed to the violation. As such, the claim in Count Four of Welsh's Amended Complaint is the same as the claim in Count Three of *Welsh I.*

> e. *Count Five of Welsh's Amended Complaint has the same nucleus of operative facts as Counts Four and Five of* Welsh I.

According to Count Five of Welsh's Amended Complaint, he "was forced to receive bond" on February 3, 2017, while confined at the Lamb County Jail, which led to his return to TCCC a few days later. Am. Compl. 14. Welsh then alleges that from February 7 to November 28, 2017, he "had his liberty and property severly [sic] restricted." *Id.* He further claims that his "property as of date of [February 3, 2017,] has been confiscated by the State where the State will only allow what it chooses to let me posses [sic] regardless of its none [sic] contraband status." *Id.* Welsh specifically complains of policies Defendant Searcy purportedly approved that provide for "automatic placement into the secure status of wing restriction with no due process hearing. It constitutes a loss of liberty and property without procedural protection to protect or limit the deprivation." *Id.* at 14–15. Welsh argues that the policy "stands in direct retaliation to the right

to Bail."[7] *Id.* at 15. Welsh also asserts in Count Five that he has been denied "the right to therapy to help with . . . emotional and volitional control disorder." *Id.* He claims that Defendant McLane has a "duty to advance [his] behavior problems by therapy." *Id.* Welsh cites violations of numerous constitutional rights, including a right to bail under the Eighth Amendment. *Id.* at 16–19.

In *Welsh I*, Welsh asserted similar claims in Counts Four and Five of his amended complaint. In Count Four, Welsh argued that his placement in punitive isolation from February 7 to November 27, 2017, was unconstitutional and he complained of denial of access to property, various privileges, and "all therapy." *Welsh I*, ECF No. 20, at 23–24. Further, although Welsh did not specifically cite an Eighth Amendment "right to bail" violation, he did challenge the constitutionality of CCRS's behavior management policy that requires officials to place SVPs in punitive isolation while they have criminal charges pending against them. *Id.* at 23, 25–26. In Count Five, Welsh also provided more specific allegations concerning alleged denial of treatment by CCRS employees Amy Goldstein and Edward Towns, in that he claimed he had been denied 293 days of counseling between February 3 and November 27, 2017. *Id.* at 30–31.

This Court dismissed the entirety of Welsh's claims in Counts Four and Five of his amended complaint in *Welsh I*. First, with respect to Welsh's assertion that his placement in punitive isolation and denial of access to property and privileges was unconstitutional, the Court held that Welsh did not allege adequate facts to support a procedural due process claim because the restrictions were either *de minimis* or they promoted "Texas's twin goals of long-term supervision and treatment." *Welsh I*, ECF No. 43, at 25–27. The Court also rejected Welsh's

---

[7] Welsh refers to a TCCC policy attached to his Amended Complaint which states: "Any resident who has pending criminal allegations as a result of behavior at the TCCC and who is awaiting arraignment or has been returned to TCCC pending hearing or trial, shall remain on wing restriction until the allegations are resolved." Am. Compl. 128.

claim concerning his placement in punitive seclusion because he never pleaded any facts demonstrating personal involvement by any individual. *Id.* at 26. Second, as to Welsh's assertion in Counts Four and Five that such action denied him sex offender treatment, the Court concluded that Welsh had not been denied "all therapy," noting that Welsh acknowledged receiving three or four sessions and that authenticated records showed he regularly refused to attend treatment sessions or had been prohibited from attending due to his behavior, and further observed that Welsh's claimed harm—prolonged duration of his civil commitment—was speculative at best because he had not pleaded any facts to support such a claim. *Id.* at 35–37. Third, insofar as Welsh challenged the constitutionality of CCRS's behavior management policy, this Court rejected those claims because Welsh could not prove an underlying constitutional violation arising from the policy's implementation. *Id.* at 33–35. Finally, the Court concluded that, to the extent Welsh claimed CCRS implemented a policy denying sex offender treatment to those housed in punitive isolation, he had failed to state a claim because he did not identify any official policy or widespread practice. *Id.* at 37–39.

Although Welsh's claim concerning his Eighth Amendment right to bail is new, the claims asserted herein are nonetheless the same for purposes of res judicata. As noted earlier, the question to be resolved is whether the claims concern the same nucleus of operative facts, not whether the "type of relief requested, substantive theories advanced, or types of rights asserted" are the same. *Fitch*, 423 B.R. at 640 (internal quotation marks omitted). Res judicata "bars the litigation of claims that either have been litigated or should have been raised in an earlier suit." *Test Masters*, 428 F.3d at 571. The claims clearly have the same nucleus of operative facts: Welsh claims he was unlawfully placed in punitive isolation from early February 2017 to late November 2017, and during that period he was denied access to certain property, privileges, and therapy.

19

> *f.   Count Six of Welsh's Amended Complaint has the same nucleus of operative facts as Counts Ten and Eleven of* Welsh I*.*

In Count Six of Welsh's Amended Complaint, he alleges that on November 13, 2017, after he protested the denial of a medical appointment, CCRS employees unlawfully seized and restrained him at the direction of Security Director Chris Woods. Am. Compl. 22–23. Welsh specifically claims that the force used by the CCRS employees, which included "joint locks and arm bars," caused him severe pain and that he suffered a head injury after an employee slammed his head to the ground multiple times. *Id.* at 23. Welsh further asserts that he was placed in punitive isolation for fifteen days without adequate hygiene products or eating utensils, which led to "sanitation issues." *Id.* Welsh states that Defendant Searcy reviewed the use of force, use of restraint, and Welsh's living conditions, and he approved of each. *Id.* Welsh lays the blame for these events at Searcy's feet due to policies, practices, or customs he implemented, as well as his failure to train Chris Woods regarding the use of force. *Id.* at 23–25.

The claim here follows the allegations raised in Counts Ten and Eleven of the amended complaint in *Welsh I.* In Count Ten, Welsh claimed CCRS employees denied him access to a medical appointment on November 13, 2017, which led to Welsh "refus[ing] to move" when taken to his housing assignment. *Welsh I*, ECF No. 20, at 56. Thereafter, Welsh averred that Security Director Chris Woods ordered an attack on Welsh in retaliation for his refusal to cooperate. *Id.* Welsh alleged that CCRS employees "applied painful arm bars," and that another employee "took [Welsh's] head and repeatedly slammed his head and face into the concrete floor," which caused swelling and bruising. *Id.* at 56–57. Welsh also accused the CCRS employees of unlawful restraint for their use of arm and leg restraints. *Id.* In Count Eleven, Welsh asserted that Woods denied him access to certain items, including hygiene products, after placing him in punitive isolation on November 13, 2017. *Id.* at 65.

As to Welsh's excessive force claim, the Court held that it was *Heck*-barred because Welsh had been convicted of tampering with or fabricating physical evidence with intent to impair under Texas Penal Code § 37.09 in connection with the events.[8]  *Welsh I*, ECF No. 43, at 53–54. Regarding Welsh's claim of unlawful restraint, the Court also dismissed it because the defendants' use of restraints did not constitute "arbitrary or shocking behavior" under the circumstances as alleged. *Id.* at 55 (quoting *Semler v. Ludeman*, Civil No. 09-0732 ADM/SRN, 2010 WL 145275, at *27 (D. Minn. Jan. 8, 2010)).  The Court further dismissed Welsh's claim in Count Eleven concerning access to property, including hygiene products, because he did not suffer any adverse effects from the alleged denial. *Id.* at 30–31.

Once more, Welsh's claims in Count Six of his Amended Complaint have the same nucleus of operative facts as those raised in Counts Ten and Eleven of *Welsh I*:  Welsh alleges that on November 13, 2017, CCRS employees unlawfully seized and restrained him in response to his protest relating to denial of a medical appointment, and in doing so they used excessive force causing injuries to his head.  He further claims that Chris Woods denied him access to hygiene products while in punitive isolation.  The claim in Count Six of Welsh's Amended Complaint is therefore the same as the claims in Counts Ten and Eleven of *Welsh I*.

      g.   *Count Seven of Welsh's Amended Complaint has the same nucleus of operative facts as Counts One, Two, Three, Four, Five, Six, Seven, Ten, and Eleven of* Welsh I.

Count Seven of Welsh's Amended Complaint represents a daisy chain of supervisory liability claims against McLane.  Welsh alleges that Defendant McLane is liable in her supervisory capacity as the Executive Director of TCCO for failing to train her subordinate, Michael Searcy.

---

[8] That conclusion, however, has since been called into question because the Texas Court of Appeals reversed Welsh's conviction and issued a judgment of acquittal. *See Welsh v. Texas*, 570 S.W.3d 963 (Tex. App.—Amarillo 2019, pet. ref'd).  The Court addresses that issue below.

Am. Compl. 27–30. Welsh argues that McLane's alleged "fail[ure] to train Michael Searcy was the direct cause [of] his policy, practice, and custom that lead to the injuries described in Counts One through Six" of Welsh's Amended Complaint. *Id.* at 28. Count Seven logically shares a common nucleus of operative facts with Counts One through Six herein in that it is wholly reliant on the factual allegations giving rise to those claims. As discussed above, Counts One through Six are premised on the notion that Searcy is liable in his supervisory capacity for either failing to train subordinates or implementing policies that those subordinates followed, leading to alleged violations of Welsh's rights. As such, Count Seven necessarily shares a common nucleus of operative facts with Counts One, Two, Three, Four, Five, Six, Seven, Ten, and Eleven of *Welsh I*. The claim in Count Seven of Welsh's Amended Complaint is therefore the same as those raised in *Welsh I*.

### 2. Defendants Searcy and McLane are in privity with the defendants of *Welsh I* because Welsh's claims are premised on theories of supervisory liability.

Welsh did not name either Searcy or McLane as Defendants in *Welsh I*. *Welsh I*, ECF Nos. 20, 43, 44. Thus, any application of res judicata to Welsh's claims against them must be based on the notion of privity. "[T]o satisfy the identity element [of res judicata], strict identity of parties is not necessary. A non-party defendant can assert res judicata so long as it is in 'privity' with the named defendant." *Johnson v. City of Hous.*, 444 F. App'x 26, 30 (5th Cir. 2011) (quoting *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1173 (5th Cir. 1992)). Privity exists in three circumstances: "(1) where the non-party is the successor in interest to a party's interest in property; (2) where the non-party controlled the prior litigation; and (3) where the non-party's interests were adequately represented by a party to the original suit." *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990).

Courts have also recognized, however, that privity is often found in circumstances beyond those that would have traditionally given rise to privity because, today, privity "is nothing more than a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to afford application of the principle of preclusion." *Clyce v. Butler*, No. 3:15-cv-793-S-BN, 2018 WL 3803861, at *3 (N.D. Tex. June 22, 2018) (quoting *Meza*, 908 F.2d at 1266), *R & R adopted by* 2018 WL 3773994 (N.D. Tex. Aug. 9, 2018). In *Clyce*, another judge of this Court thoroughly explored some of the theories recognized by the Fifth Circuit that underly application of privity in nontraditional circumstances:

> Where a plaintiff has sued parties in serial litigation over the same transaction; where plaintiff chose the original forum and had the opportunity to raise all its claims relating to the disputed transaction in the first action; where there was a "special relationship" between the defendants in each action, if not complete identity of parties; and where although the prior action was concluded, the plaintiff's later suit continued to seek essentially similar relief—the courts have denied the plaintiff a second bite at the apple.

*Id.* at *5 (quoting *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1288–89 (5th Cir. 1989) (collecting cases)). The Fifth Circuit in *Lubrizol* referred to those cases as achieving a "practical result" under such circumstances. 871 F.2d at 1289 (adopting this privity application and concluding that claim preclusion was appropriate based on the special relationship between an employer and employee). The undersigned finds that this same use of privity is appropriate to Welsh's case.

The sole theory of liability behind Welsh's claims in this case is based upon Defendants Searcy and McLane's positions as supervisory officials at TCCO and TCCC. *See* Am. Compl. 1–30. Welsh names Searcy and McLane as Defendants on the grounds that they supervised others who violated his rights. *Id.* As shown by the foregoing discussion of Welsh's claims raised here and in *Welsh I*, those "others" that Searcy and McLane allegedly supervised were the named

defendants in *Welsh I.* Throughout Counts One through Seven, Welsh's only grounds for holding Searcy and McLane liable for constitutional violations are that they either implemented policies that led to violations of Welsh's constitutional rights, or they failed to train subordinates and that such failure led to the violation of Welsh's constitutional rights. *Id.* Welsh aims to take a second bite at the apple: This Court dismissed Welsh's claims for constitutional violations against the individuals that he asserted personally violated his rights (*Welsh I*, ECF No. 20, 43, 44); now, he seeks to hold the alleged supervisors of those same individuals personally responsible because their implementation of policies or failure to train those *Welsh I* defendants purportedly led to violations of his constitutional rights by the *Welsh I* defendants. Am. Compl. 1–30. "[T]here is no good reason why [Welsh] should now have a second chance with defendants who, for no good reason, were not joined in the first action." *Clyce*, 2018 WL 3803861, at *8. Indeed, these are clear examples of the types of claims that "should have been raised in an earlier suit." *Test Masters*, 428 F.3d at 571. As such, Defendants Searcy and McLane are in privity with the defendants in *Welsh I.*

### 3. Counts One through Seven of Welsh's Amended Complaint should be dismissed because they are barred by the doctrine of res judicata.

Viewing Welsh's claims in this case alongside those raised in *Welsh I* creates a clear picture of Welsh's tactics. He has taken this Court's ruling in *Welsh I*, received an unfavorable judgment regarding the individuals he claimed personally violated his rights, and refined his claims to assert herein that those individuals' supervisors should now be held liable for the violations. Litigation tactics like these are wasteful of judicial resources and an abuse of the judicial process. Any claim against Searcy and McLane, in their capacities as the alleged supervisors of the defendants named in *Welsh I*, could and should have been raised in that case, as the claims are inextricably intertwined and their resolution at that time would have prevented needless repetitive

24

litigation. Indeed, most, if not all, of Welsh's claims here would also fail due to the doctrine of issue preclusion[9] because this Court has already ruled that Welsh's constitutional rights were not violated by the actions of the *Welsh I* defendants.[10]

"One of the aims of res judicata is to avoid the inefficiencies of the splitting of claims and serial litigation regarding the same incidents. Its application here will well serve those aims." *Clyce*, 2018 WL 3803861, at *6–7. The undersigned therefore recommends dismissal of Counts One through Seven of Welsh's Amended Complaint as barred by the doctrine of res judicata. The undersigned notes a wrinkle in this analysis regarding the excessive force allegations contained in Count Six, which it will address in the following section.

### 4. Welsh's Count Six claim against Defendant Searcy arising from the alleged use excessive force by CCRS employees should be dismissed with prejudice for failure to state a claim.

As for Count Six of Welsh's Amended Complaint, the Texas Court of Appeals in March 2019 reversed Welsh's conviction for tampering with or fabricating evidence in connection with the events raised in that claim. *See Welsh*, 570 S.W.3d 963. Welsh has appealed this Court's dismissal of his claims in *Welsh I*, raising that issue, and that appeal remains pending. *Welsh v. Correct Care Recovery*, Case No. 19-10825 (5th Cir. 2019). In the event that the Fifth Circuit reverses and remands that aspect of this Court's judgment in *Welsh I*, that prior ruling will lose its preclusive effect, i.e., it would no longer be a final judgment on the merits of that claim.

---

[9] "Under the doctrine of issue preclusion, a prior judgment forecloses successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Herrera v. Wyoming*, 139 S. Ct. 1686, 1697 (2019) (internal alterations, ellipses, and quotation marks omitted).

[10] Supervisory liability requires that a plaintiff prove an underlying constitutional violation arising from the supervisor's actions. *See Romero v. Brown*, 937 F.3d 514, 523 (5th Cir. 2019) (noting that a supervisor must implement "unconstitutional policies that causally result in the constitutional injury" (internal quotation marks omitted)); *Zadeh v. Robinson*, 928 F.3d 457, 473 (5th Cir. 2019) (stating that a plaintiff must prove that a supervisor's "failure to train resulted in the violation of the plaintiff's rights").

Nevertheless, an alternative substantive basis exists for dismissing Welsh's excessive force claim asserted in Count Six.

In Count Six, Welsh alleges that Defendant Searcy violated his constitutional rights by failing to train CCRS employees, including Security Director Chris Woods, concerning the use of force, which led to these individuals using excessive force on November 13, 2017. Am. Compl. 22–23, 25. When alleging supervisory liability premised on the failure to train subordinates, a plaintiff must prove: "(1) the supervisor's failure to train; (2) the failure to train resulted in the violation of the plaintiff's rights; and (3) the failure to train shows deliberate indifference." *Zadeh*, 928 F.3d at 473. Welsh's claim falls short of adequately alleging the deliberate indifference element.

Deliberate indifference "is an 'extremely high' standard to meet." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009). To prove deliberate indifference regarding a supervisor's failure to train, the plaintiff must show that the supervisor had "actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights and the actor nevertheless [chose] to retain that program." *Id.* (internal alterations, ellipses, and quotation marks omitted). The Supreme Court has said that the supervisor's failure to train must amount to "conscious disregard" for the plaintiff's constitutional rights. *Connick v. Thompson*, 563 U.S. 51, 71 (2011).

Although Welsh's Amended Complaint is peppered with allegations of excessive force by CCRS employees, only the allegations raised in Count Six are of any consequence.[11] Given that fact, Welsh's Amended Complaint alleges only a single, isolated incident of allegedly excessive

---

[11] As previously demonstrated herein, each of the other counts should be dismissed with prejudice as barred by res judicata. More importantly, this Court in *Welsh I* has already ruled that those other incidents did not state claims for excessive force, thus rendering them ineffectual for proving a pattern of conduct by CCRS employees.

force used by CCRS employees. Am. Compl. 22–23. But deliberate indifference generally requires that the supervisor "must usually know about a pattern of similar violations." *Romero*, 937 F.3d at 523 (internal quotation marks omitted). The single incident alleged is simply not enough to demonstrate that Searcy had actual or constructive notice that omissions in the training program would lead to CCRS employees violating Welsh's rights. *See, e.g.*, *Piotrowski v. City of Hous.*, 237 F.3d 567, 581–82 (5th Cir. 2001) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984)) (concluding that "'[i]solated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for . . . section 1983 liability,' and that an official policy 'cannot ordinarily be inferred from single constitutional violations'"). As such, the undersigned recommends dismissing Welsh's claim against Searcy alleging that his failure to train CCRS employees led to those employees using excessive force.

## B. Official capacity claim against McLane

The question before the Court is not whether an injunction should be granted, but whether Welsh has adequately stated a claim for relief such that his request for an injunction should be allowed to proceed. *See New River Shopping Ctr., LLC v. Villenurve*, Civil Action 17-281-SDD-RLB, 2018 WL 665146, at *3 (M.D. La. Feb. 1, 2018) ("On a 12(b)(6) motion the Court may only determine if there is a sufficient factual basis for the relief sought, in this instance a permanent injunction following a trial on the merits."). Nonetheless, the "availability and scope of injunctive relief is dictated by the nature of the [alleged] violation," and requests for injunctive relief that are "fatally overbroad" are subject to dismissal. *Williams v. Recovery Sch. Dist.*, 859 F. Supp. 2d 824, 833 (E.D. La. 2012) (dismissing claims for injunctive relief pursuant to Rule 12(b)(6) after concluding plaintiff failed to adequately plead underlying violations and his requests were fatally overbroad and could not be granted). Furthermore, requests for injunctions must be adequately

27

specific and thus allow a court to craft a narrowly tailored remedy that provides the party sufficient guidance as to what conduct is prohibited. *Id.*

Initially, the Court notes that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."[12] *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). When a plaintiff requests injunctive relief that would require a court to interfere with the administration of a state civil commitment facility, "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976). "[J]udicial deference is accorded not merely because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Bell*, 441 U.S. at 548.

Welsh's official capacity claim against Defendant McLane seeks injunctionive relief concerning numerous matters. Am. Compl. 31–39. In reviewing his various prayers for relief, the requests may be broadly categorized as pertaining to his conditions of confinement, the amount of sex offender treatment he receives on a weekly basis, and the confiscation of his property. *Id.* at 35–40. But upon closer inspection it becomes clear that Welsh improperly asks this Court to

---

[12] The Court recognizes that civilly committed persons are not prisoners, and their rights may differ from those criminally incarcerated. *See Bohannan v. Doe*, 527 F. App'x 283, 289–90 (5th Cir. 2013) (per curiam) (holding that the Prison Litigation Reform Act does not apply to civilly committed sex offenders because they "are not prisoners," in accord with other circuits); *In re Commitment of Fisher*, 164 S.W.3d 637, 653 (Tex. 2005) (emphasizing that civil commitment "is a civil matter"). Nevertheless, this Circuit and other courts have addressed civil rights lawsuits from civilly committed individuals within the same substantive framework as similar suits brought by prisoners. *See, e.g., Smith v. Hood*, 900 F.3d 180, 186 (5th Cir. 2018) (citing *Youngberg*, 457 U.S. at 316 for the proposition that due process rights that survive criminal incarceration "must also survive involuntary commitment"); *R.R. v. N.J. Dep't of Corrs.*, 962 A.2d 563, 568 (N.J. Super. Ct. App. Div. 2009) (upholding a visitation policy at a civil commitment center that was identical to the same policy at state prisons). This Court thus evaluates Welsh's claim by applying the same substantive standards to his case as would apply in a similar case brought by a prisoner.

manage TCCC's daily operations,[13] something this Court is neither prepared nor generally authorized to do. See *Bell*, 441 U.S. at 548. Further, Welsh's requests for injunction are vague at best, and provide no legitimate basis for the Court to consider, much less grant, imposition of extraordinary relief such as an injunction.

Given the nature of Welsh's requests, the Court should dismiss Welsh's requests for injunctive relief as being overbroad, vague, and asking the Court to step outside its constitutionally-defined role and instead invade Texas's sovereign authority to redraft a civil commitment scheme. *See Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) (noting that "the Constitution . . . affords a state wide latitude in crafting a civil commitment scheme" because "the state legislatures not only are equipped, but also possess the democratic mandate, to make difficult policy choices regarding the supervision and treatment of sexually violent predators"); *see also Kansas v. Hendricks*, 521 U.S. 346, 368 n.4 (1997) (stating that officials "enjoy wide latitude in developing treatment regimens [for SVPs]").

### C. Constitutional challenge to Texas Health & Safety Code Chapter 841

Welsh's Amended Complaint also arguably raises a constitutional challenge to Texas Health & Safety Code Chapter 841, alleging that it "invidiously single[s] out a politically unpopular group to impose a significant burden towards an identifiable subgroup of criminals[:] the sex offender." Am. Compl. 40–55. To the extent Welsh is attempting to challenge the facial constitutionality of civil commitment and the statutory scheme used in Texas, he fails to state a viable claim for relief. *See, e.g., Hendricks*, 521 U.S. at 350, 360 (recognizing the

---

[13] *See, e.g.*, Am. Compl. 35 (asking the Court to enter an injunction requiring "rules that do serve a legitimate institutional purpose [and] to be the least drasctic [sic] means to accomplish their objective"), 36 (requesting an injunction "to scrap the whole behavioral plan as it is clearly a Bill of Attainder; also seeking injunction against policy permitting double bunking), 39 (asking for injunction requiring a minimum of 40 hours of sex offender therapy per week), 39–40 (requesting injunctions requiring return of confiscated property and prohibiting Defendant McLane from confiscating property without just compensation).

29

constitutionality of a Kansas state law similar to Texas statute, which establishes procedures for civilly committing SVPs); *Fisher*, 164 S.W.3d at 656 (upholding Texas's procedures for the civil commitment of SVPs). As to any effort by Welsh to attack the validity of his civil commitment, such a claim is not cognizable under § 1983 because it is barred by *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). *See Hill v. McLane*, 5:17-CV-205-C, ECF No. 8, at 2–3 (N.D. Tex. Feb. 15, 2018) (citing authority and holding that *Heck* precludes individuals from challenging the validity of their civil commitment through a § 1983 claim). In either event, the undersigned recommends dismissal of Welsh's apparent freestanding claim challenging the constitutionality of his civil commitment.

## V.    Recommendation

For the foregoing reasons, the undersigned recommends that Defendants' Motion to Dismiss under Rule 12(b)(6) be **GRANTED** and that the United States District Court **dismiss with prejudice** Welsh's Amended Complaint filed on August 8, 2019, and all claims therein for failure to state a claim upon which relief can be granted.[14]

## VI.    Right to Object

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2017); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and

---

[14] The undersigned further recommends dismissing Defendants' prior motions to dismiss and for judgment on the pleadings (ECF Nos. 18, 44) as moot because they concerned Welsh's prior complaint. Additionally, the undersigned recommends dismissing Welsh's recently-filed "Motion for Preliminary Injunction" (ECF No. 80) as moot because dismissal of this action in its entirety, including Welsh's claims for injunctive relief, will necessarily preclude the relief he seeks in his motion.

specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: January 30, 2020

_____
**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**

31